## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COUNCIL FOR UROLOGICAL INTERESTS**<br>**101 Village Gate Dr.**<br>**Chapel Hill, N.C. 27514**<br><br>　　　**Plaintiff**<br><br>　　　v.<br><br>**MICHAEL O. LEAVITT, in his official capacity as**<br>**Secretary of the Department of Health and Human**<br>**Services**<br>**200 Independence Avenue, S.W.**<br>**Washington, D.C. 20201**<br><br>　　　**and**<br><br>**United States of America,**<br><br>　　　**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)  **Civ. No. 07**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

1.　　Plaintiff Council for Urological Interests ("CUI") brings this action on behalf of its members, seeking declaratory and injunctive relief against Michael Leavitt, in his official capacity as Secretary of the Department of Health and Human Services (the "Secretary"), and the United States of America. CUI seeks a declaration that certain regulations promulgated by the Centers for Medicare and Medicaid Services ("CMS") concerning the interpretation and enforcement of the Social Security Act are arbitrary and capricious and contrary to statutory authority, in contravention of the Administrative Procedure Act, 5 U.S.C. §§ 701-706. CUI further seeks a declaration that § 626 of the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA"), Pub. L. 108-173, 117 Stat 2320, codified at 42 U.S.C.

§ 1395*l*(i)(2)(C)-(D), constitutes an impermissible delegation of legislative powers. CUI requests that the Court enjoin the Secretary from enforcing the regulations because of these violations, and that it preclude enforcement of § 626 of the MMA on the basis that it is unconstitutional.

## PARTIES

2.      Plaintiff CUI is a not-for-profit corporation organized under the laws of the District of Columbia and with its principal place of business in Chapel Hill, North Carolina. The members of CUI consist of companies that provide lithotripsy and ancillary urologic services, primarily to hospitals. The companies all engage in this business in co-venture with urologists. All together, the members of CUI represent over half of the nation's 10,000 urologists in their medical businesses. The companies which comprise CUI represent the majority of the urologist-venture businesses that earlier made up the now-defunct American Lithotripsy Society ("ALS").

3.      Defendant Michael O. Leavitt is the Secretary of the United States Department of Health and Human Services ("HHS"). He is sued in his official capacity. Through CMS, an agency within the Department of Health and Human Services, the Secretary administers the program for health insurance for the aged created under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg ("Medicare").

4.      The Secretary maintains the headquarters of HHS in Washington, D.C.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this case pursuant to 42 U.S.C. § 405 and 28 U.S.C. § 1331.

6.      Venue in this Court is proper under 42 U.S.C. § 405 and 28 U.S.C. § 1391(e)(1).

## **FACTUAL ALLEGATIONS**

### LITHOTRIPSY

7.      Extracorporeal shock wave lithotripsy ("lithotripsy") is a non-invasive surgical method for the treatment of urinary tract stones (commonly known as "kidney stones"). Developed in the 1980s as an alternative to invasive surgical treatment, lithotripsy has been successfully used millions of times to treat patients suffering from painful kidney stones.

8.      Lithotripsy is performed using a "lithotripter" machine which generates acoustic shock waves.  The doctor using the lithotripter directs these shock waves at the target stone, which is identified and located using a fluorscoptic x-ray or ultrasound device.  The lithotripter's shock waves break the stone into smaller pieces, allowing the stone to pass through the urinary tract and out of the body.

9.      Prior to the development of the lithotripsy procedure, the treatment of choice for urinary tract stones was invasive surgery.  Surgery to remove urinary tract stones is performed in a hospital.  Surgical treatment of kidney stones is a major surgery—necessitating a one-week post operative hospital stay and a six to eight-week home recovery for the patient.

10.     By contrast, urologists can perform lithotripsy on a hospital outpatient basis, in mobile units, through ambulatory surgical center ("ASCs"), or in hospital rooms with transmobile machines.

11.     Most patients who undergo lithotripsy recover in one or two days.

12.     Lithotripsy is a safer procedure for the removal of urinary tract stones than surgery.  Other options, such as ureteroscopy with placement of a stent, exist for the treatment of stones, but the procedure still must be performed in an operating room and entails more pain for the patients.  Lithotripsy accordingly is the preferred medical treatment for stones.

13.    Although individual lithotripsy procedures are far less expensive than alternative invasive surgical treatment options, lithotripter machines are expensive, costing with ancillary equipment between $500,000 and $1,000,000 to purchase. Maintenance of the machines costs approximately $50,000 per year.

14.    Because of the significant initial capital costs to acquire lithotripters, urologists frequently purchase them collectively. The cost of acquiring and maintaining the lithotripter is recouped through technical fees charged to hospitals, insurance carriers, or patients. A physician receives compensation for his services in performing lithotripsy through a separate professional fee.

15.    The technical fee comprises the majority of the total cost of a lithotripsy procedure. The capital costs of lithotripters are thus the largest factor in the overall cost of the procedure.

## THE RISING USE OF ASCs TO PROVIDE OUTPATIENT SURGICAL CARE

16.    Traditionally, medical services could be provided either in a physician's office or in a hospital setting. As medical science has evolved, however, an increasing number of surgical procedures can be performed on an "outpatient" basis. Outpatient surgical procedures are surgical procedures that, while beyond the scope of a physician's office, do not require overnight hospitalization.

17.    ASCs often have a number of advantages over traditional hospitals that allow them to provide outpatient procedures at reduced costs and at locations more convenient to many patients. Because ASCs do not provide overnight care, they operate with lower overhead and payroll costs. Also, ASCs do not supply emergency care, greatly reducing their costs as compared to hospitals. However, the ability of ASCs to operate at lower costs is dependent on

4

the volume of procedures and the avoidance of procedures that either require expensive equipment or significant amounts of time to perform. In addition, given their fixed costs, most ASCs are able to stay in business only if they perform a certain number of procedures.

## PAYMENT FOR LITHOTRIPSY UNDER THE MEDICARE PROGRAM

18.     Medicare is a system of federally funded health insurance for the aged, the disabled and those suffering from end-stage renal disease. Congress has established rules governing the Medicare program under the aegis of the Social Security Act. 42 U.S.C. §§ 1395-1395ggg. CMS administers the Medicare program.

19.     Approximately 21% of patients who receive lithotripsy treatment have insurance coverage under the Medicare program. An additional 4% are covered under other federal programs. The remaining 75% have private insurance, or have no insurance at all.

20.     Medicare reimburses healthcare providers for lithotripsy procedures performed in hospitals on an inpatient or outpatient basis. As discussed below, despite well documented congressional intent to the contrary, Medicare has not historically reimbursed providers for lithotripsy services performed in ASCs. Beginning January 1, 2008, however, such procedures are reimbursable.

## THE FIRST LITHOTRIPSY LITIGATION

21.     In response to a congressional directive, in 1990 CMS's predecessor agency, the Health Care Financing Administration ("HCFA"), determined that there was no medical reason why lithotripsy had to be performed in a hospital. In December 1990, HCFA proposed adding lithotripsy to the list of surgical procedures that could be performed at ASCs.

22.     Congress directed HCFA to consider adding lithotripsy to the list of approved ASC procedures from a desire to save money. HCFA originally paid for technical services

5

incident to a lithotripsy procedure based on the cost or customary charges of the hospital. Because hospitals typically added, rather than saved, cost, Congress viewed ASCs as a more economical alternative to hospitals. Congress hoped to reduce Medicare costs by encouraging patients to receive treatment at ASCs instead of hospitals.

23.     In 1990, HCFA proposed that charges for lithotripsy, other than professional fees, be reimbursed at $812 per procedure. HCFA provided little explanation on how it arrived at that number.

24.     In response to its proposal, HCFA received more than 170 comments stating that the proposed rate was too low. More than 100 lithotripsy centers provided comments, often supported by empirical data, showing that a rate of $2,500 or more was appropriate. Despite these comments, HCFA issued a final regulation in December 1991 that raised the rate to $1,150. Again, HCFA did not explain its methodology or give a basis for this number, other than to suggest hostility to physician ownership of lithotripters. HCFA did recognize, however, the capital-intensive nature of lithotripsy by creating a new category 9 for the procedure.

25.     In January 1992, ALS sued HCFA to enjoin HCFA from proceeding with the ASC payment rate until HCFA complied with the law and detailed its methodology for arriving at the $1,150 rate.

26.     In March 1992, this Court agreed with ALS that HCFA had acted improperly. Accordingly, this Court remanded the notice of rate for lithotripsy and ordered HCFA to publish its basis for setting the new rate. *American Lithotripsy Society v. Sullivan*, 785 F. Supp. 1034, 1036-37 (D.D.C. 1992).

27.    HCFA chose not to explain its rate and instead refused to pay for lithotripsy in an ASC setting.  HCFA further insisted that it would pay for lithotripsy performed by urologists using their own machines only when done "under arrangement" with a hospital.

## THE SECOND LITHOTRIPSY LITIGATION

28.    In 1989, Congress passed legislation, commonly known as "Stark I," designed to reduce healthcare fraud by limiting the ability of physicians to order clinical lab work for their patients from labs in which they had a financial interest.  In 1993, Congress passed "Stark II" which extended the law to prohibit a physician from referring a Medicare patient for one of ten "designated health services."  Under Stark II, a physician may not refer a Medicare patient for one of the designated health services to an entity in which the physician has a financial interest.

29.    The premises underlying Stark I and Stark II were the same:  to prevent physicians from having a financial incentive to over-utilize medical services.

30.    Lithotripsy was never a "designated health service" and, in fact, the congressional record shows that Congress never intended the Stark regulations to apply to lithotripsy.  HCFA nevertheless saw the passage of Stark II as another opportunity to discourage physician ownership of lithotripters, based on its stated view, unsupported by any empirical evidence, that physician ownership caused "distortions" in the marketplace.  In reality, the cost of lithotripsy had fallen dramatically once physicians began purchasing lithotripters.

31.    HCFA accordingly included lithotripsy in its Stark II regulations, in defiance of Congress's directive.  HCFA took the position that since lithotripsy was required (by virtue of HCFA rules) to be performed "under arrangement" with a hospital, the procedure constituted a hospital in-patient or outpatient service.

32.     Once again, ALS filed suit in this Court to enjoin HCFA from enforcing its regulations, Case No. 01-01812 (D.D.C.).  On July 12, 2002, this Court granted ALS's motion for summary judgment and permanently enjoined CMS from enforcing the Stark regulations with respect to lithotripsy.

33.     Between March 1992 and August 2007, HCFA/CMS never enacted a final ASC lithotripsy rate.  As a result, during this fifteen year span lithotripsy could only be provided to Medicare patients if the treating urologist's joint venture was acting "under arrangement" with a hospital.

34.     Commencing on January 1, 2008, lithotripsy may be provided in a Medicare-certified ASC pursuant to the revised ASC payment system described below.

### REVISIONS TO THE MEDICARE PAYMENT SYSTEM FOR ASCs

35.     On December 8, 2003, Congress passed the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA"), Pub. L. 108-173.   The MMA represented the single largest overhaul of the Medicare system since the system's inception in 1965.

36.     In addition to revising the prescription drug benefits available under the Medicare system, the MMA also directed CMS to revise its payment procedures and schedules for ASCs. Unlike with other recent revisions to Medicare payment systems, Congress did not specify the guidelines CMS should follow, other than mandating that revisions be budget neutral.   The MMA instead directed the Government Accountability Office ("GAO") to provide guidance to CMS on the methodology it should use in setting payment schedules.   The MMA also specifically directed CMS to "take into account the recommendations in the [GAO] report" when promulgating the rules for the new ASC payment system.

## THE GAO REPORT

37.    In furtherance of the mandate to produce a new payment system for surgical procedures provided at ASCs, Congress directed the GAO to study and prepare a report addressing several issues related to the ASC payment system.

38.    Specifically, Congress directed the GAO to study and prepare a report on the following matters:

> (i) The appropriateness of using the groups of covered services and relative weights established under the outpatient prospective payment system as the basis of payment for ambulatory surgical centers.
>
> (ii) If the relative weights under such hospital outpatient prospective payment system are appropriate for such purpose—
>
>> (I) whether the payment rates for ambulatory surgical centers should be based on a uniform percentage of the payment rates or weights under such outpatient system; or
>>
>> (II) whether the payment rates for ambulatory surgical centers should vary, or the weights should be revised, based on specific procedures or types of services (such as ophthalmology and pain management services).
>
> (iii) Whether a geographic adjustment should be used for payment of services furnished in ambulatory surgical centers, and if so, the labor and nonlabor shares of such payment.

Pub. L. 108-173 § 626(d).

39.    Congress further directed that CMS take the GAO findings and recommendations into account when issuing new regulations establishing payments rates for procedures performed in ASCs.

40.    The GAO did not publish its report by January 1, 2005, as directed by Congress. Indeed, it was not until November 30, 2006 that the GAO published its report.  Even then, it failed to address all of the topics set forth in the MMA.

41.    In its November 30, 2006 report, the GAO addressed whether payment for ASCs should be based on the existing Medicare Out Patient Prospective Payment System ("OPPS").

42.    The GAO report concluded that the ASC payment system could appropriately be based upon the OPPS, taking into account the lower relative costs of procedures when performed in ASCs.

43.    The GAO report did not, however, address whether the relationship between the OPPS and the ASC payment system should be uniform, or varied based upon individual procedures or groups of procedures.  The GAO thus did not make a recommendation whether ASC rates should be the same percentage as OPPS rates, for all procedures, or whether the percentage should vary from procedure to procedure.

44.    In the past, CMS has not hesitated to delay its implementation of new payment systems, even in the face of statutory deadlines, when it has needed more time to make a rational decision or to receive input from others.  In this instance, CMS chose not to await the GAO report, but instead proceeded to propose a revised ASC payment system on August 23, 2006.  71 FR 49506 (Aug. 23, 2006).  CMS acknowledged that its regulations were done without the benefit of the GAO report.

45.    The public comment period for the proposed ASC payment system closed on October 10, 2006, or a month before the GAO issued its report.  Whether the GAO deliberately delayed issuance of its report until after the public comment period closed on the CMS regulations, and whether it did so at CMS's request, is unclear.

46.    Several commentators requested that CMS reopen the comment period if, and when, the GAO published its report.  CMS declined these requests.

47.    CMS further refused to reopen the public comment period for the proposed revised ASC payment system rule after the GAO issued its report.  As a result, the public was not

afforded an opportunity to comment on the GAO report or its applicability to CMS's proposed ASC payment system.

48.    On August 2, 2007, CMS published its final regulations for the ASC payment. 72 FR 42470 (Aug. 2, 2007). Those regulations go into effect on January 1, 2008.

49.    CMS relied upon the GAO report to support positions taken in the final regulations. For example, CMS cited the recommendation in the GAO report in support of its decision to base the revised ASC payment system on the OPPS and establish a uniform conversion factor for ASC payment rates.

50.    In several respects, the GAO report does not support the position taken by CMS in its regulations. Moreover, CMS's assumptions regarding the relationship between the costs of procedures in ASCs and hospital outpatient departments are otherwise unsubstantiated.

51.    CMS did not request or accept public comments regarding the topics on which it invoked the GAO report.

<u>THE REVISED ASC PAYMENT SYSTEM</u>

52.    The rule which CMS adopted for the ASC payment system is based on the OPPS.

53.    Under the OPPS, procedure codes are assigned a relative weight based on CMS's determination of the cost of providing the given procedure relative to other procedures.

54.    On an annual basis, CMS publishes a "conversion factor," taking into account various pricing components. The conversion factor is used to calculate the reimbursement due to a provider for performing a given procedure. Multiplying the conversion factor by the relative weight yields the presumptive reimbursement dollar amount for a given procedure. This presumptive amount may be further modified to take into account other factors such as geographic wage discrepancies.

55.    Under the CMS's final rule as adopted, ASCs are to be paid using the same relative weight classification used in the OPPS, but based on a conversion factor separately determined for ASCs. For 2008, the ASC conversion factor will be 65% of the OPPS conversion factor. By this suit, CUI does not challenge either the relevant weight for lithotripsy, or the ASC conversion factor.

<u>EXCEPTIONS TO THE REVISED ASC PAYMENT SYSTEM</u>

56.    Because ASCs generally have lower overhead and operational costs than hospitals, they are able to provide most services at reduced costs. ASCs' economic advantages are derived largely from reduced manpower and overhead expenditures. Because the ASC is able to provide quality healthcare at a reduced cost (relative to hospitals) it is often appropriate that the reimbursement rates paid by Medicare to ASCs are lower than those paid to hospitals.

57.    There are certain procedures, however, for which the cost of the procedure remains relatively fixed regardless of where the procedure is performed.

58.    For example, the costs of many procedures involving implantable or single use medical devices are independent of where they are performed. The costs of the medical devices themselves are fixed. Furthermore, in procedures involving medical devices, the cost of procuring the device represents a significant portion of the total cost of the procedure. Thus, the economic advantages of the ASC, i.e. lower overhead, do not work to reduce the cost of providing care in these device-intensive procedures to the same extent that they would in other surgical procedures.

59.    This is one of the factors that the GAO should have considered in the report mandated by Congress in recommending whether CMS should rely on a uniform percentage of the OPPS rate or instead set a percentage on a procedure-by-procedure basis.

60.    CMS received several public comments to its proposed rule which pointed out that, if adopted, the across-the-board application of a reduced OPPS rate to the ASC setting would essentially preclude the provision of a number of medical device-intensive services in ASCs because the reduced reimbursements would not cover the ASCs' base costs in acquiring the needed medical devices.

61.    Several public comments also noted that lithotripsy, like device-intensive procedures, cannot be performed economically in ASCs under the proposed rule because the reduced ASC conversion factor results in payments that do not cover the costs of acquiring and maintaining the lithotripter, much less the full costs of the lithotripsy procedure.  In other words, because the major cost component of the lithotripsy procedure is the acquisition and maintenance of the lithotripter machine, ASCs are unable to transfer their operational efficiencies to these costs.  Therefore, ASCs will not realize significant cost savings over hospitals when providing lithotripsy care.

62.    The final revised ASC payment system promulgated by CMS makes an exception for device-intensive procedures where the cost of a medical device is fifty percent or more of the payment rate.  In those cases, the ASC will be reimbursed at the full OPPS rate for the costs of the medical devices.  CMS did not publish any empirical data to support the 50% threshold nor was the threshold authorized by the MMA.

63.    CMS found that, absent such a deviation for device-intensive procedures, "under the revised ASC payment system device-intensive procedures would be underpaid if [CMS] paid for them as proposed.  [CMS] would not expect the ASCs' device costs for expensive devices would differ significantly from the device costs of [hospital outpatient departments] because

[CMS does] not believe that ASCs would realize more substantial efficiencies in their acquisition of devices in comparison with [hospital outpatient departments]."

64.    The same reasoning applies to lithotripsy. The device costs of lithotripters for ASCs are not different from the device costs for hospitals. In both cases, the costs of acquiring and maintaining the device are more than 50% of the cost of the total procedure.

65.    Despite the fact that the same reasoning used to justify the exception for device-intensive procedures in the revised ASC payment system applies with equal force to lithotripsy, CMS refused to identify lithotripsy as a device-intensive procedure. It instead limited the scope of the exception to implantable or single use devices. CMS further failed to explain its reasoning for this distinction, which was nowhere authorized by the MMA or recommended by the GAO report.

66.    CUI and its members have no means of obtaining relief through HHS's administrative channels to challenge this arbitrary exclusion from the device-intensive category. CUI and its members are not "providers" or "suppliers" of services under the Social Security Act. The ASCs themselves do not have a basis to challenge the rates paid by Medicare under the revised ASC payment system, nor do they have a financial motive to challenge the regulations. As a result, CUI and its members have no standing to challenge the revised ASC payment system through the administrative avenues established in the Social Security Act, and no means of having their position advanced by others.

BUDGET NEUTRALITY

67.    One of the mandates of the MMA was that the revised ASC payment system remain "budget neutral." The budget neutrality provision requires that in the year the revised payment system is implemented, the system must be designed to result in the same aggregate

14

amount of expenditures for surgical services furnished in ASCs as would have been made if the system had not been revised.

68.    As a result of changes in the ASC payment system, CMS acknowledged that certain procedures would "migrate" from hospital outpatient centers to ASCs and vice-versa. Notwithstanding the large number of procedures that would migrate, and the varying cost of each procedure, CMS arbitrarily and without meaningful explanation determined that the net economic impact of migrations would precisely offset, thereby preserving budget neutrality.

69.    In addition to substantially revising the ASC payment system, CMS, of its own accord and without explanation, also expanded in the same rule the list of Medicare approved procedures that may be performed in the ASC setting. CMS added nearly 800 new procedures to the ASC approved list.

70.    The growth in the number of approved procedures contemporaneously with the implementation of a revised ASC payment system increased the complexity of designing and implementing a payment system that was budget neutral. It also added dramatically to the difficulty of arriving at migration assumptions. CMS nevertheless assumed that, once again, the economic impact of the thousands of migration flows would exactly offset each other, resulting in perfect budget neutrality.

71.    CMS relied on a number of arbitrary assumptions, unsupported by any scientific surveys or studies, in arriving at its perfect migration offsets. Not surprisingly, CMS failed to provide the public with actual budget figures or procedure-by-procedure migration assumptions that would allow interested parties to test CMS's claims of budget neutrality. The public thus did not have the opportunity to provide meaningful comment on CMS's migration assumptions and to point out flaws in those assumptions.

72.     Several public comments that were made demonstrated that CMS ignored important factors contributing to migration to and from ASCs. Had such factors been taken into account, the final budget neutral conversion factor would have been substantially higher.

73.     As a result of moving so many new procedures into the ASC setting and relying on arbitrary migration assumptions, the uniform conversion factor will result in lower aggregate expenditures for surgical procedures performed in ASCs and per procedure reimbursement rates for many procedures. The lower rates will frustrate Congress's goal of encouraging the use of ASCs by Medicare and Medicaid patients.

### COUNT I (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

74.     CUI realleges and incorporates by reference ¶¶ 1-73 above as if fully set forth herein.

75.     CMS's adoption of the revised ASC payment system as set forth in the regulations published on August 2, 2007 and the preamble to the regulations is arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

76.     The MMA did not authorize CMS to make a specific exception for device-intensive procedures, to the exclusion of other similar procedures. The MMA further did not authorize CMS to adopt such exceptions without first taking into account findings and recommendations by the GAO. Moreover, CMS's decision to make limited exceptions for device-intensive procedures, but not to include lithotripsy, was arbitrary and capricious.

77.     Similarly, CMS's decision to recognize that the high fixed costs of device-intensive procedures reduces the efficiencies realized by the use of an ASC while ignoring, without explanation, reason, or comment, the high fixed costs of lithotripsy was arbitrary and capricious.

78.     The decision to apply the uniform conversion factor to lithotripsy despite its high fixed costs will cause immediate harm to CUI and its members, who will be unable to economically provide quality medical treatment to Medicare patients in the ASC setting.

79.     The revised ASC payment system will cause immediate harm to CUI and its members, who will be unable to economically provide quality medical treatment to Medicare patients in the ASC setting.

## COUNT II (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

80.     CUI realleges and incorporates by reference ¶¶ 1-79 above as if fully set forth herein.

81.     CMS's adoption of the revised ASC payment system as set forth in the regulations published on August 2, 2007 and the preamble to the regulations, and in particular its adoption of a uniform percentage (except for device-intensive procedures), without first receiving a complete report from the GAO, is arbitrary and capricious and without observance of procedure required by law in violation of 5 U.S.C. § 706(2).

82.     CMS acted arbitrarily, capriciously, and contrary to the requirements of 5 U.S.C. § 553 by failing, without good cause, to provide a period of public comment on the partial GAO report, a substantial technical basis for the final revised ASC payment system.  CMS further acted arbitrarily and capriciously by ostensibly relying on the GAO report when the report did not support the methodology set forth in the regulations.

83.     The revised ASC payment system and the uniform conversion factor, which is purportedly based on technical bases that were unavailable for public comment, will cause immediate harm to CUI and its members, who will be unable to economically provide quality medical treatment to Medicare patients in the ASC setting.

## COUNT III (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

84.    CUI realleges and incorporates by reference ¶¶ 1-83 above as if fully set forth herein.

85.    CMS's adoption of the revised ASC payment system as set forth in the regulations published on August 2, 2007 and the preamble to the regulations is arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

86.    Specifically, CMS has attempted to comply with the budget neutrality requirements of the MMA in an arbitrary and capricious manner.

87.    CMS based its budget neutrality analysis on arbitrary and capricious assumptions, and failed to explain meaningfully its rationale and reasoning, thereby denying the public an opportunity to comment.

88.    The budget neutrality calculation, being based on arbitrary and capricious assumptions, will cause immediate harm to CUI and its members, who will be unable to economically provide quality medical treatment to Medicare patients in the ASC setting

## COUNT IV (VIOLATION OF THE ANTI-DELEGATION DOCTRINE)

89.    CUI realleges and incorporates by reference ¶¶ 1-88 above as if fully set forth herein.

90.    With § 626 of the MMA, Congress effectively delegated to CMS the power to determine whether medical procedures performed in ASCs should be paid based on OPPS rates. CMS further delegated to CMS the power to determine how much would be paid for such medical procedures.

91.    Congress did not provide any intelligible principles to guide how CMS should set payment rates for ASCs. Congress instead delegated the task of providing guidance to the GAO,

an unelected body. Even if the GAO could perform legislative acts as Congress's proxy, the GAO chose to address only one of the two tasks assigned it by Congress and did not provide any guidance to CMS regarding the establishment of payment rates.

92.    The only guiding principle Congress enunciated in the MMA for CMS was that the total costs to the Medicare program for the medical procedures involved be budget neutral. Congress did not provide any intelligible principles for CMS to follow on how to achieve budget neutrality.

93.    Section 626 of the MMA represents an improper delegation to the Executive Branch of legislative powers and is therefore unconstitutional.

WHEREFORE, Plaintiff prays for the following relief:

a.    That the Court enter an order enjoining the Secretary from enforcing the regulations promulgated on August 2, 2007;

b.    That the Court declare § 626 of the MMA unconstitutional as an impermissible delegation of legislative power;

c.    That the Court award attorneys' fees to CUI pursuant to the Equal Access to Justice Act; and

d.    That the Court award such other relief as it deems appropriate and as justice requires.

Respectfully submitted,

WINSTON & STRAWN

Gordon A. Coffee  #384613
gcoffee@winston.com
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5000

Attorneys for Plaintiff Council for
Urological Interests

Dated:  December 31, 2007

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Council for Urological Interests | Michael O. Leavitt<br>United States of America |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    11001<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF<br>LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Thomas L. Mills<br>Gordon A. Coffee<br>Winston & Strawn, LLP<br>1700 K Street, N.W.<br>Washington, D.C. 20006<br>(202) 282-5000 | |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

⊙ 2 U.S. Government
Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place<br>of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place<br>of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a<br>Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

| ○ **A.** *Antitrust* | ○ **B.** *Personal Injury/*<br>*Malpractice* | ⊙ **C.** *Administrative Agency*<br>*Review* | ○ **D.** *Temporary Restraining*<br>*Order/Preliminary*<br>*Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☒ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If<br>Administrative Agency is Involved) | Any nature of suit from any category may<br>be selected for this category of case<br>assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ **E.** *General Civil (Other)*    **OR**    ○ **F.** *Pro Se General Civil* |
|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or<br>defendant<br>☐ 871 IRS-Third Party 26<br>USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure<br>of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational<br>Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC<br>Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced &<br>Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br>Exchange<br>☐ 875 Customer Challenge 12 USC<br>3410<br>☐ 900 Appeal of fee determination<br>under equal access to Justice<br>☐ 950 Constitutionality of State<br>Statutes<br>☐ 890 Other Statutory Actions (if<br>not administrative agency<br>review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original
Proceeding

○ 2 Removed
from State
Court

○ 3 Remanded from
Appellate Court

○ 4 Reinstated
or Reopened

○ 5 Transferred from
another district
(specify)

○ 6 Multi district
Litigation

○ 7 Appeal to
District Judge
from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

5 U.S.C. § 701-706. Arbitrary and capricious agency action in violation of the Administrative Procedure Act and the Medicare Act.

**VII. REQUESTED IN COMPLAINT**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____
JURY DEMAND: YES ☐ NO ☒
Check YES only if demanded in complaint

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE 12/31/07    SIGNATURE OF ATTORNEY OF RECORD    *Gordon G. Offer*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.