## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COUNCIL FOR UROLOGICAL INTERESTS | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| MICHAEL O. LEAVITT, in his official capacity as<br>Secretary of the Department of Health and Human Services | ) | Civ. No. 07-2343-HHK |
| And | ) | |
| United States of America, | ) | HEARING REQUESTED |
| Defendants. | ) | |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Council for Urological Interests ("CUI") hereby opposes the Motion to Dismiss (the "Motion") filed by Defendants.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .............................................................................................. v

I.    Introduction ..................................................................................................... 1

II.   Congress has not precluded judicial review over CUI's claims because CUI does
      not challenge any of the proscribed aspects of CMS's ASC system ...................... 6

      A.    Defendants have mischaracterized CUI's claims in an effort to put them in
            the ambit of the jurisdiction-stripping provisions of the Medicare Act ............ 10

      B.    The "budget neutrality" requirement does not divest this Court of
            jurisdiction ................................................................................................ 11

III.  CUI is exempt from the channeling requirements of the Medicare Act because it
      is not a "supplier" within the meaning of the Act, and there is no "supplier" who
      shares CUI's interests ..................................................................................... 12

      A.    Plaintiff cannot bring its claim administratively and no other Medicare
            supplier has an incentive to bring the same claims .................................... 13

IV.   CUI has standing to challenge the regulations as CUI has alleged an injury to its
      procedural rights .............................................................................................. 16

V.    CUI has stated a valid claim for relief under the anti-delegation doctrine ................ 18

VI.   Conclusion ...................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs v. Gardner*,
    387 U.S. 136, 141 (1967)..................................................................5

*Am. Chiropractors Ass'n v. Leavitt*,
    431 F.3d 812 (D.C. Cir. 2005)..........................................................13

*Am. Lithotripsy Soc'y v. Sullivan*,
    785 F. Supp. 1034, 1036-37 (D.D.C. 1992)......................................1

*\*Am. Lithotripsy Soc'y  v. Thompson*,
    215 F. Supp. 2d 23 (D.D.C. 2002)..............................................1, 13

*Am. Society of Dermatology v. Shalala*,
    962 F. Supp. 141, 145 (D.D.C. 1996)............................................8, 9

*Amgen, Inc. v. Smith*,
    357 F.3d 103 (D.C. Cir 2004)....................................................10, 11

*Atlantic Urological Assocs. v. Leavitt*,
    -- F. Supp. 2d --, 2008 WL 1931443 (D.D.C. May 5, 2008)...........14

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340, 351 (1984)..................................................................5

*Bowen v. Mich. Acad. of Family Physicians*,
    476 U.S. 667, 670 (1986)....................................................5, 6, 9, 10

*Heckler v. Ringer*,
    466 U.S. 602 (1984).....................................................................7, 8

*I.N.S. v. Cardoza-Fonseca*,
    480 U.S. 421, 432 (U.S. 1987).........................................................9

*Lorillard v. Pons*,
    434 U.S. 575, 580 (1978).................................................................9

*\*McNary v. Haitian Refugee Center, Inc.*,
    498 U.S. 479, 497-98 (1991) ...................................................7, 8, 10

*Mistretta v. United States*,
    488 U.S. 361, 379 (1989)................................................................19

*Nat'l Athletic Trainers Ass'n, Inc. v. U.S. Dept. of Health and Human Services*,
    455 F.3d 500 (5th Cir. 2006) ....................................................15, 16

*Nat'l Wrestling Coaches Ass'n v. Dep't of Education*,
   366 F.3d 930 (D.C. Circ. 2004) ...............................................................16, 17, 18

*Painter v. Shalala*,
   97 F.3d 1351 (10th Cir. 1996) ..........................................................................8

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*,
   489 F.3d 1267 (D.C. Cir. 2007) ..............................................................16, 17, 18

*Schechter Poultry v. United States*,
   295 U.S. 495, 537-41 (1935) ...........................................................................18

*Shalala v. Illinois Council on Long Term Care*,
   529 U.S. 1, 19 (2000)..................................................................................12, 13

*Triad at Jeffersonville I, LLC v. Leavitt*,
   -- F. Supp. 2d --, 2008 WL 1777404 (D.D.C. Apr. 21, 2008) .............................14

*Universal Health Services v. Sullivan*,
   770 F. Supp. 704 (D.D.C. 1991) .................................................................10, 11

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457, 472 (2001)............................................................................18, 19

*Yakus v. United States*,
   321 U.S. 414, 425-426 (1944) .........................................................................19

STATUTES

5 U.S.C. § 706 *et seq*...................................................................................6, 7

8 U.S.C. § 1329............................................................................................7

38 U.S.C. § 211(a) .......................................................................................7

42 U.S.C. § 1395*l*(i)(2)(D)(v) ..........................................................4, 5, 6, 9, 10

42 U.S.C. § 1395w-4(i)(*l*)(B).............................................................................8

42 U.S.C. § 1395w-4(i)(*l*)(C).............................................................................9

72 Fed. Reg. 42511 .......................................................................................17

72 Fed. Reg. 42519 .......................................................................................18

Medicare Prescription Drug Improvement and Modernization Act, Pub L. 108-173 .......... passim

OTHER AUTHORITIES

GOVERNMENT ACCOUNTABILITY OFFICE, Payment for Ambulatory Surgical Centers Should Be
Based on the Hospital Outpatient Payment System, (2006) .........................................21

## I.    Introduction

This case centers on a congressional mandate to extend medical treatment for Medicare recipients to Ambulatory Surgical Centers ("ASCs"), the dearth of standards accompanying that mandate, and the failure of the Centers for Medicare and Medicaid Studies ("CMS") to carry out the mandate in compliance with the Administrative Procedure Act ("APA").

For the past 20 years, Congress has struggled with constraining the growth in Medicare expenses.  Among the means Congress has explored to reduce those costs is to transition, where medically appropriate, minimally invasive surgical procedures out of the hospital setting and into ASCs.  Lithotripsy, which uses acoustic shock waves generated by lithotripters to break up stones in the kidneys and urinary tract, is one such procedure.

In 1990, CMS (through its predecessor agency, the Health Care Financing Administration ("HCFA")) concluded that lithotripsy could be performed in an ASC setting.  To that end, CMS approved a payment rate for the procedure.  In a foreshadowing of the present dispute, however, CMS developed the rate through a process which employed no discernable standards or methodology, and which appeared motivated solely by a disdain for the fact that physicians often collectively owned the lithotripters they used to perform lithotripsy on their patients.  Unmoved by public comments criticizing the black box manner in which it set the rate and how the rate bore little relation to the actual costs of providing lithotripsy, CMS refused to take any corrective actions other than a modest adjustment to the rate.  This led to litigation, resulting in this Court enjoining CMS in 1992 from proceeding with the ASC rate until it detailed its methodology. *Am. Lithotripsy Soc'y v. Sullivan*, 785 F. Supp. 1034, 1036-37 (D.D.C. 1992).

Apparently unwilling to set an ASC rate for lithotripsy through a transparent process, CMS instead chose not to pay for lithotripsy in ASCs at all.  As a result, for almost two decades

the vast majority of Medicare reimbursable lithotripsy procedures were performed "under arrangement" with hospitals—at greater cost than was necessary to both Medicare beneficiaries and the Medicare system as a whole.  In the meantime, while content to keep lithotripsy performed on Medicare patients in a higher-cost hospital arena, CMS attempted to prevent collective physician ownership of lithotripters through changes to regulations under the Stark Act.  Those changes led to further litigation with CMS and a further injunction against CMS. The injunction issued by this Court permanently prohibited CMS from enforcing the offending regulations with respect to lithotripsy.  *See Am. Lithotripsy Soc'y v. Thompson*, 215 F. Supp. 2d 23 (D.D.C. 2002).

In 2003, Congress, recognizing the important contribution that ASCs can make to stabilizing the Medicare system, ordered CMS to revise the ASC payment system as part of the Medicare Prescription Drug Improvement and Modernization Act ("MMA"), Pub L. 108-173. Unfortunately, Congress gave CMS no direction or meaningful guidance on how a revised ASC payment system should operate.  Instead, Congress delegated that obligation to the GAO, asking that agency to prepare a report for CMS to "consider."  GAO never fully complied with that directive.  Compl. ¶¶ 38, 40.

Having received no guidance from Congress, and only an incomplete (and late) report from the GAO, CMS took the carte blanche given it by Congress and ultimately produced a revised payment system.  Not surprisingly, that system proved to be based on numerous arbitrary and capricious decisions and assumptions developed in contravention of the APA.  As a result, CUI, taking up the mantle from the American Lithotripsy Society, filed the instant action.

Defendants have moved to dismiss all four counts of the Complaint.  They initially contend that Counts I-III, which challenge CMS's (and hence the Secretary's) violations of the

APA, are barred by the provisions of the MMA precluding judicial review of the classification system, relative weights, payments amounts, or geographic adjustment factor. As detailed in the Complaint, that challenge is not aimed at the specific reimbursement rate for lithotripsy or lithotripsy's classification, but rather at the failure of CMS to comply with the APA when establishing a methodology for the ASC payment system. Evidently unable, as they must, to accept those allegations of the Complaint as true for purposes of their Motion, Defendants have resorted to either re-characterizing or disputing those allegations or responding to them with their own assertions that are well outside the four corners of the Complaint. It is too early in the game, however, for Defendants to be pursuing what is in essence a motion for summary judgment, particularly when the administrative record has not been provided either to the Court or CUI. Defendants' effort to recobble the Complaint to bring it inside the statutory categories for which judicial review is barred accordingly must fail.

Defendants' exhaustion and standing arguments fare no better. Failing to recognize either the factual distinctions raised by this case or the prior pronouncements of this Court, Defendants urge that CUI's claims must be dismissed because CUI and its members did not pursue administrative remedies. However, because neither CUI nor its members are considered suppliers under the prospective payment system, they have no right to seek administrative relief. Moreover, the ASCs themselves have no interest in mounting a similar challenge, as evidenced by the failure of any ASC to file an administrative appeal since the regulations went into effect six months ago. Defendants' standing argument rests on a similar misunderstanding of the nature of the relationship between CUI's members and the ASCs at which they perform lithotripsy. Contrary to Defendants' assertion, the impact of the CMS regulations is not reflected in how much the ASCs decide to pay CUI's members; it is reflected in the decision of those

members on where to perform lithotripsy—hospital or ASCs.  That impact presents a justiciable situation far different from the cases relied upon by Defendants.

Count IV of the CUI Complaint challenges the constitutionality of the MMA under the anti-delegation doctrine.  Defendants attack that count on the theory that the anti-delegation doctrine is easily satisfied by a showing of intelligible principles.  Yet, in their Motion, Defendants have not responded with a specific identification of the standards by which Congress directed CMS to promulgate implementing regulations.  Indeed, despite the indignation that accompanies Defendants' recitation of the relevant case law, Defendants have failed to point to any provision in either the MMA's text or legislative history which provides even a modicum of guidance from Congress to CMS on how to construct the revised ASC payment system.  Congress effectively delegated to CMS its legislative power to structure the ASC payment system.

In short, there is ample basis for this Court's jurisdiction over CUI's Complaint, and CUI has stated a cause of action for which relief can be granted.  Accordingly, Defendants' Motion should be denied.

## II.    Congress has not precluded judicial review over CUI's claims because CUI does not challenge any of the proscribed aspects of CMS's ASC system.

The initial contention raised in the Motion is that this Court lacks jurisdiction over CUI's claims because Congress has precluded review under 42 U.S.C. § 1395*l*(i)(2)(D)(v).[1]  Contrary to the implication of the Motion, however, Congress did not bar any judicial challenge to any aspect of the implementing regulations.  Rather, Congress barred judicial review of four discrete aspects of the regulations, none of which is at issue here.

---

[1]    The statute provides that "[t]here shall be no administrative or judicial review under section 1395ff of this title, section 1395oo of this title, or otherwise, of the classification system, the relative weights, payment amounts, and the geographic adjustment factor, if any, under this subparagraph."  42 U.S.C. § 1395*l*(i)(2)(D)(v).

Cognizant of the congressional delineation of the topics off-limits to judicial scrutiny, CUI limited its Complaint to: (1) the Secretary's decision to create without statutory authorization an exception for device-intensive procedures, (2) the Secretary's disregard of the congressional mandate to consider the GAO report, (3) the arbitrary manner in which the Secretary attempted to achieve budget neutrality, and (4) Congress's violation of the anti-delegation doctrine. None of these inquiries is barred by the MMA. Defendants nevertheless attempt to reformulate the Complaint in an effort to bring its claims within the ambit of the four proscribed categories. Such recobbling of the Complaint is inappropriate, particularly in a motion to dismiss. Judging the Complaint simply by the allegations in it, the Court can readily discern that CUI's challenge to the manner in which CMS promulgated the regulations falls outside the four categories listed in section 1395*l*(i)(2)(D)(v).

Absent from the Motion is the acknowledgement that judicial review is the norm and legislative proscription of such review the exception. As the Supreme Court has noted, there is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). If it were otherwise, "statutes would in effect be blank checks drawn to the credit of some administrative officer or board." *Id.* (citations omitted). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs v. Gardner*, 387 U.S. 136, 141 (1967). "Where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984). Defendants may only overcome their heavy burden by showing "*specific* language or *specific* legislative history" showing that Congress did

not intend for judicial review to be available.  *Bowen*, 476 U.S. at 672.  Defendants have shown neither.

A.    **Defendants have mischaracterized CUI's claims in an effort to put them in the ambit of the jurisdiction-stripping provisions of the Medicare Act.**

Defendants' assertion that "CUI seeks to revisit the relative weight attributed to lithotripsy and the payment amount that the Secretary has assigned for lithotripsy" (Def.'s Mem. at 7) is belied by the Complaint itself.  *See* Compl. ¶ 55 ("By this suit, CUI does not challenge either the relevant weight for lithotripsy or the ASC conversion factor.").  Defendants dismiss this statement as "mere *ipse dixit*."  Def.'s Mem. at 8.  Defendants then allege, without citation to any specific allegation of the complaint, that it is "perfectly plain" that CUI seeks a review of the classification system and the relative weights."  *Id.* at 8-9.

What is "perfectly plain," however, is that CUI seeks no such thing.  *See* Compl. ¶ 55. CUI concedes, as it must, that 42 USC § 1395*l*(i)(2)(D)(v) precludes judicial review of the four specific categories set forth in the statute:  the classification system, relative weights, payment amounts, and the geographic adjustment factor.  But the effect of the statute is limited by its specific terms, *Bowen*, 476 U.S. at 672, and nowhere does the statute bar the methodology challenge raised here.

The challenge CUI raises, as articulated in the Complaint, is not to the classification system, relative weights, payment amounts, or the geographic adjustment factor.  Rather, CUI challenges CMS's compliance with the requirements of the APA, 5 U.S.C. § 706 *et seq*., the process used by CMS in determining the structure of the ASC payment system generally, CMS's failure to comply with the MMA's directive to consider the GAO report, and the unilateral determination to create a category of procedures known as "device intensive."  Such collateral

procedural challenges to agency rules, as opposed to challenges to individual rates, have long been recognized as falling outside jurisdiction stripping clauses.

The Supreme Court has recognized the "critical difference" between a challenge to an individual determination and a challenge to the procedures used by an agency in reaching that determination. *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 497-98 (1991). In *McNary,* the plaintiffs sought judicial review of the Immigration and Naturalization Service's policies and procedures for evaluating immigration amnesty applications filed by agricultural workers. The defendants moved to dismiss the complaint under a provision of the immigration statute that prohibited "judicial review of a determination respecting an application for adjustment of [immigration] status." *Id.* at 486 n.6 (quoting 8 U.S.C. § 1160(e)). This language, the Court concluded, referred to a "single act" and prohibited only "direct review of individual denials of [changes in immigration] status, rather than as referring to general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.* at 492. The Court further supported its decision by noting that Congress could have adopted the more expansive language that it had used previously in other statutes. *Id.* at 494 (broader language Congress has previously employed includes "all causes . . . arising under any of the provisions" (citing 8 U.S.C. § 1329) and "on all questions of law and fact" (citing 38 U.S.C. § 211(a)).

The *McNary* Court also distinguished the holding in *Heckler v. Ringer*, 466 U.S. 602 (1984). In that case the plaintiffs sought judicial review of the denial of Medicare benefits for a specific surgical procedure, without exhausting the administrative remedies available to them as Medicare beneficiaries. *Id.* at 611-12. The Court held that the plaintiffs were required to channel their claims through agency review, at least in part, because the relief they sought was

"the invalidation of the Secretary's current policy and a 'substantive' declaration . . . that the expenses of [their surgeries] are reimbursable under the Medicare Act." *Id.* at 614.  In contrast, the *McNary* plaintiffs did not "seek a substantive declaration that they [were] entitled to [changed immigration status]" and "if allowed to prevail in this action, [plaintiffs] would only be entitled to have their case files reopened and their applications reconsidered in light of the newly prescribed [agency] procedures." *McNary*, 498 U.S. at 495.

CUI's Complaint states a cause of action in line with the holding in *McNary*.  CUI asserts that CMS has violated the APA in the manner in which it has conceived and developed the revised ASC payment system.  CUI does not seek a declaration that the lithotripsy rate be revised, or that the rate increase.  As in *McNary*, there is no guarantee that an ASC payment system revised in accordance with the APA would necessarily result in a direct benefit to CUI or its members.  However, CUI and its members are entitled to an ASC payment system that was promulgated in accordance with the law, regardless of whether they would financially benefit under such a system or not.

None of the other cases relied upon by Defendants is applicable or require dismissal of CUI's case.  All of those decisions involved the application of jurisdiction stripping statutes which were materially different from the statute Defendants claim is applicable to this case.  For example, in *American Society of Dermatology v. Shalala*, the jurisdiction statute at issue specifically precluded review of "*the determination* of relative values . . . ." 962 F. Supp. 141, 145 (D.D.C. 1996) (citing 42 U.S.C. § 1395w-4(i)(*l*)(B)) (emphasis added).  The *Dermatology* court noted that the statute specifically prohibited consideration of a "challenge to HCFA's [now CMS's] *determination* of RVUs and *establishment* of the coding system." *Id.* at 146.  Defendants' citation to *Painter v. Shalala*, 97 F.3d 1351 (10th Cir. 1996) serves them no better.

In that case the Tenth Circuit, interpreting section 1395w-4(i)(*l*)(C)[2] found that Congress intended to "preclude administrative and judicial review of the *manner* in which the conversion factor is calculated." *Painter*, 97 F.3d at 1356. In both *Painter* and *Dermatology* the jurisdiction-stripping statute at issue unquestionably encompassed the claim brought by the plaintiffs.

Defendants never address, because they cannot, the fact that the statute at issue in this case materially deviates from earlier jurisdiction stripping provisions contained within the Medicare Act. Rather, by referring to the "similarly precise language" used in 1395*l*(i)(2)(D)(v), Defendants act as if the statutory language was identical to that discussed above. Def.'s Mem. at 8. To the contrary, Congress chose to use more limited language here. Defendants' effort to rewrite the statute (akin to its effort to rewrite the Complaint) is contrary both to the Supreme Court's determination that Congress may deprive a court of jurisdiction only when "specific language" is used, *Bowen, supra,* and to the cannons of statutory construction. Congress is presumed to be aware of an "administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Similarly, when Congress passes an act containing language that varies from that contained in statutes which have previously been the subject of judicial or administrative interpretation, courts should consider the changed language as evidence that Congress intended the new statute's effect to be different from that of the earlier statute. *See, e.g., I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432 (U.S. 1987) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally

---

[2]    "There shall be no administrative or judicial review under section 1359ff of this title or otherwise of . . . the *determination* of conversion factors." 42 U.S.C. § 1395w-4(i)(*l*)(C) (emphasis added).

presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations omitted).

If Congress had intended to limit judicial review of agency procedures and practices under this provision of the MMA, "it could easily have used [the] broader statutory language" it had previously employed.    *McNary*, 498 U.S. at 491-92 (1991).    To accord section 1395*l*(i)(2)(D)(v) the broad reading suggested by Defendants would render Congress's deliberate use of the phrase "determination of" in other statutes surplusage, which this Court cannot do.

**B.    The "budget neutrality" requirement does not divest this Court of jurisdiction.**

As a last resort, Defendants assert that the sheer complexity of the Medicare system itself, and the budget neutrality requirement, makes judicial review impossible, and evidences congressional intent to preclude judicial review of CMS's process in its entirety.  Def.'s Mem. at 10.  This argument has been rejected by the courts.  In *Universal Health Services v. Sullivan*, 770 F. Supp. 704 (D.D.C. 1991), *aff'd* 978 F.2d 745 (D.C. Cir. 1992), the defendant argued, as Defendants do here, that budget neutrality precludes judicial review.  The court rejected that argument:

> The Secretary's concerns about judicial interference with his budget neutrality calculations are also unwarranted. That a challenge to the validity of the reclassification decisions may result in disruption of the budget neutrality calculations in certain fiscal years does not justify allowing the Secretary to conduct these calculations based upon guidelines which may be in violation of federal law.

*Universal Health Services*, 770 F. Supp. at 711.

The case cited by Defendant, *Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir 2004), for the proposition that budget neutrality is a basis for rejecting jurisdiction, involves a different statutory scheme.  The *Amgen* case concerned a challenge to the reimbursement rate for a single

drug or class of drugs, used in the treatment of anemia and not a challenge to the methodology employed in arriving at the rates paid by CMS for drugs generally. *Amgen, Inc.*, 357 F.3d at 105. Indeed the *Amgen* court expressly recognized the difference between the challenge to the Secretary's determination brought by Amgen, and that presented by the plaintiff in *Universal Health Services*. *See Amgen*, 357 F.3d at 113 ("[T]he validity of certain system wide determinations by the Secretary has been held to be available notwithstanding an express preclusion on review of individual determinations.") (citing *Universal Health Services*, 770 F. Supp. at 711-12) . Because CUI makes a general challenge to CMS's compliance with the APA and the MMA, *Universal Health* is more relevant to the consideration of the budget neutrality argument in this case.

Second, Defendants' argument presumes that the regulations should not be disturbed because they achieve the goal of budget neutrality. In this case, one of the challenges CUI raises in its Complaint is to whether the revised ASC payment system is, in fact, budget neutral. Specifically, in Count III of its Complaint, CUI alleges that the Secretary did not perform a legitimate budget neutrality calculation. *See* Compl. ¶¶ 67-73, 84-88. As detailed in the Complaint, CMS's budget neutrality calculations were not calculations at all, but rather were simply offsetting assumptions. Apparently overwhelmed by the complexity of (1) determining which individual medical procedures would likely migrate from one setting to another, and (2) calculating the monetary impact of those migrations,[3] CMS simply chose to assume it would all result in a net wash. Specifically, CMS arbitrarily assumed that as a result of the revised ASC payment system, all medical procedure migrations between hospitals and ASCs would exactly offset one another. Compl. ¶¶ 68, 71. CMS further assumed that migration effects would

---

[3]    "Migration" in this context refers to the movement of procedures from hospitals to ASCs or doctors' offices in response to changes in the payment system.

exactly offset the impact of the approval of 800 additional procedure types for ASCs.  Compl. ¶ 70.  Underscoring the implausibility of these assumptions, they were not supported by any empirical evidence or actual budget data, or at least none made available for public review.  The public thus had no real opportunity to test the validity of CMS's assumptions and to offer comments on them, in violation of the APA.[4]


### III.    CUI is exempt from the channeling requirements of the Medicare Act because it is not a "supplier" within the meaning of the Act, and there is no "supplier" who shares CUI's interests.

Defendants also contend that the complaint must be dismissed because CUI has not presented its claims in an administrative forum.  Here, however, CUI, not being a Medicare provider or supplier, cannot seek administrative relief for its claims.  Moreover, ASCs lack the incentive to bring CUI's claims on CUI's behalf.  CUI's claims, therefore, need not be presented administratively before the Court may exercise jurisdiction over the case.  While the Medicare Act typically channels claims arising under it through the administrative process established by the Secretary, this requirement does not apply when it would, as a practical matter, effectively preclude judicial review.  *See Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 19 (2000).

---

[4]    Defendants twice refer to the January 1, 2008 statutory deadline for CMS to implement the revised ASC payment system, and suggest that the deadline excused CMS's failure to provide the public a more transparent methodology on which to comment.  Def's. Mem. at 5, 10.  Yet, CMS has not hesitated in the past to violate such deadlines, and has pointed, ironically, to the need to comply with the APA as justification for ignoring the deadline.  *See e.g.*, Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4523, 111 Stat. 251, 445-450 (codified, as amended, at 42 U.S.C. § 1395l(t)) (for the Outpatient Prospective Payment System Congress intended that the payment system would be in place for 1999; however, CMS (then HCFA) did not publish its final OPPS rule until April 7, 2000, 65 Fed. Reg. 18,434); Balanced Budget Refinement Act of 1999, Pub.L. 106-113, § 124, 113 Stat. 1501, 1501A-332 (Congress required that the new Hospital inpatient psychiatric facility PPS be in place for cost-reporting periods beginning on or after October 1, 2002, but CMS delayed that rule until January 1, 2005 citing "the need for further analysis and careful assessment of potential payment impacts, combined with the long lead times in connection with the rulemaking process." TOMMY G. THOMPSON, REPORT TO CONGRESS: PROSPECTIVE PAYMENT SYSTEM FOR INPATIENT SERVICES IN PSYCHIATRIC HOSPITALS AND EXEMPT UNITS 5 (2002)).

A.     **Plaintiff cannot bring its claim administratively and no other Medicare supplier has an incentive to bring the same claims.**

Perhaps the most relevant authority is the one that Defendants relegate to a footnote: *American Lithotripsy Society v. Thompson*, 215 F. Supp. 2d 23 (D.D.C. 2002). The plaintiff in that case represented many of the very same lithotripsy providers aggrieved by the Secretary's actions in this case. Compl. ¶¶ 2, 32. As in the current controversy, the plaintiff's members were not Medicare suppliers, and therefore not eligible to pursue administrative appeals. The government nevertheless argued that the members could have created standing to appeal by violating the regulations at issue. *Am. Lithotripsy Soc'y*, 215 F. Supp. 2d at 28. This Court refused, however, to force the plaintiff's members to subject themselves to the "draconian" sanctions for violations of the Physician Self-Referral law in order to gain access to federal court. *Id.* at 30. This Court further found that hospitals, which could have pursued an administrative claim, were satisfied with the rules and did not have an incentive to bring a claim. *Id.* Thus, where an aggrieved party is unable to bring an administrative claim itself, and no person with the ability to bring an administrative claim has the incentive to do so, this Court has found that requiring an exhaustion of administrative remedies would, as a practical matter, preclude judicial review altogether. In this case, CUI has even less access to the administrative process than its predecessor plaintiff in *American Lithotripsy Society*. CUI simply cannot, at any cost or risk, bring an administrative challenge to the ASC rulemaking,

Rather than address this Court's decision in *American Lithotripsy Society*, Defendants instead invoke the decision in *American Chiropractors Ass'n v. Leavitt*, 431 F.3d 812 (D.C. Cir. 2005). There, the D.C. Circuit reversed the District Court's partial denial of summary judgment on the grounds that the plaintiff had not exhausted its administrative remedies. The court reasoned that Medicare enrollees who were patients of the plaintiff chiropractors could assign

13

their right to payment to the chiropractors and thus give the chiropractors standing to pursue administrative remedies. Here, no such assignment would be possible because an ASC may not reassign its right to payment—even if it were inclined to do so—to CUI's members. As Defendants themselves note, a beneficiary may not assign a reimbursement claim to anyone other than the provider or supplier of the services. Def.'s Mem. at 2. The ASCs, not CUI or its members, are the suppliers to whom a claim may be assigned.

The other cases cited by Defendants are similarly inapposite. Defendants cite two other cases as examples of the limited nature of the exception permitting federal question jurisdiction over Medicare Act claims. In *Triad at Jeffersonville I, LLC v. Leavitt*, -- F. Supp. 2d --, 2008 WL 1777404 (D.D.C. Apr. 21, 2008), the court ruled that an operator of nursing homes did not meet the *Illinois Council* exception based on its claim that it did not have "sufficient economic resources to continue operating its nursing facilities" if CMS recouped the $2.0 million overpayment at issue. The court described this as "an individual hardship based on delay," and not a "systemic deprivation of review," and thus ruled that jurisdiction was barred by the Medicare Act. Similarly, in *Atlantic Urological Assocs. v. Leavitt*, -- F. Supp. 2d --, 2008 WL 1931443 (D.D.C. May 5, 2008), the court ruled that the *Illinois Council* exception did not apply to physicians' claims that the challenged rule would "drive them out of the diagnostic testing business." *Id.* at *9. The court held that "[p]laintiffs' argument that administrative review will be costly and time-consuming does not transform their claim into one where judicial review is essentially precluded." *Id.* at *11. In both of these cases, however, and unlike here, the plaintiffs themselves (as Medicare providers or suppliers) had access to the administrative process and unsuccessfully argued that the economic burden of channeling their claims effectively precluded judicial review. In this case, it is CUI's inability to bring an administrative claim at all that

14

effectively precludes judicial review of its claims and allows it to satisfy the *Illinois Council* exception.

Defendants' fallback argument is that the absence of any administrative remedy is not dispositive because the ASCs themselves could pursue an administrative appeal. Def.'s Mem. 12. What Defendants gloss over is that in the six months since the ASC payments rate went into effect, not a single ASC has filed a challenge to the regulations echoing in whole or part the allegations made by CUI. Defendants nevertheless urge that because "ASCs were active participants in the notice-and-comment process regarding the calculation of payment rates for lithotripsy," (Def.'s Mem. 13), the rationale of *National Athletic Trainers Ass'n, Inc. v. U.S. Dept. of Health and Human Services*, 455 F.3d 500 (5th Cir. 2006) applies. That case involved a challenge by an association of athletic trainers to a regulation limiting payment for physical therapy services to licensed physical therapists.

The court found that an injunction would have directly benefited physician providers by allowing them to lower their costs by hiring athletic trainers at lower salaries than other occupational or physical therapists. *Id.* at 507. The court also pointed to public comments by physicians in response to the proposed rule advocating the exact outcome the plaintiff sought by its suit, namely that the agency withdraw the proposed reimbursement rule. The court found that physician employers had the same incentives as their athletic trainer employees to challenge the rule. Because the physicians had the ability to pursue an administrative appeal, the court held that the trainers were barred from judicial relief.[5]

---

[5] The *National Athletic Trainers* case was decided before the Secretary announced a change of policy regarding administrative appeals. On December 28, 2007, the Secretary proposed new rules under which all decisions of the Departmental Appeals Board would be subject to review and possible reversal by the Secretary. Under the rule, the Secretary would be the ultimate decisionmaker on the legality of regulations the Secretary promulgated. Courts have not yet ruled on how the vesting of both rulemaking

In this case, the interests of CUI and ASCs do not overlap to the same extent as in *National Athletic Trainers*. Far from being employer and employee, ASCs and the physicians' companies which provide lithotripsy at the ASCs typically operate at arm's-length. Moreover, the ASCs do not have the same financial incentives as the CUI members. For that reason, the ASCs and the CUI (and its members) filed separate comments addressing separate aspects of the MMA regulations.[6]

Contrary to Defendants' contention, ASCs do not have motive to challenge the Secretary's arbitrary treatment of lithotripsy because the lithotripsy suppliers, not the ASCs, will bear the financial impact of the regulations. ASCs typically recover a set fee from the reimbursement rate; any change in the rate flows to CUI's members. Moreover, in the event that ASCs are affected by the rate, they are not likely to challenge the methodology used to set the rate, as evidenced by the absence of ASC appeals of the payment system. Those ASCs impacted by the regulations and payment methodology instead have either: (1) discontinued providing lithotripsy and focused on offering other, more lucrative medical procedures or (2) found low-cost suppliers, many of whom use older, less effective equipment, to treat Medicare patients.

## IV.   CUI has standing to challenge the regulations as CUI has alleged an injury to its procedural rights.

The third prong of Defendants' attack on CUI's right to seek judicial review is the assertion that CUI has no standing. Citing *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267 (D.C. Cir. 2007), and *Nat'l Wrestling Coaches Ass'n v. Dep't of Education*, 366 F.3d 930 (D.C. Circ. 2004), Defendants assert that CUI's stake in the ASC

---

authority and administrative review in the same person would affect the channeling requirement under the Medicare Act.

[6]    For the most part CMS ignored the comments submitted by CUI and its members, in keeping with its longstanding hostility to physician ownership of lithotripters.

payment system, and hence CUI's benefit from this litigation, depends on the actions of ASCs and the reaction of the ASCs to the payment level. Def.'s Mem. at 16. Defendants further contend that CUI's case is based on the assumption that if CUI prevails, "it and its members would benefit when ASCs share a portion of the potentially increased Medicare payments for those services." Def.'s Mem. at 14.

In *Renal Physicians Ass'n*, the alleged harm resulted from the decisions of hospitals to decrease the compensation of their physician medical directors in response to implementation of a regulatory safe harbor under the Stark Act. 489 F.3d at 1272. Similarly, in *Nat'l Wrestling Coaches Ass'n*, the plaintiffs complained of the decision of various educational institutions to eliminate or reduce the size of men's wrestling programs in the wake of Department of Education regulations implementing Title IX. 366 F.3d at 935.

Here, CUI's claims do not hinge on what the ASCs do or not do, and the harm befalling CUI's members is not a consequence of the actions or inactions of the ASCs. In contrast to the plaintiffs in the *Renal Physicians Ass'n* and *Nat'l Wrestling Coaches Ass'n* cases, who were at the mercy of third parties, CUI's members currently enjoy considerable autonomy in determining whether to provide lithotripsy for Medicare patients at ASCs or to continue to perform the procedure at hospitals. *See* Compl. ¶¶ 10, 16.

Indeed, as noted above, the CMS's budget neutrality determination depends on the assumption that a certain number of lithotripsy procedures will migrate at the behest of physicians from hospitals and doctors' offices to ASCs. *See* 72 Fed. Reg. 42511 ("a setting-neutral payment system is most consistent with the principle that physicians should be free to make site-of-service decisions on the basis of clinical and quality of care considerations alone"); 72 Fed. Reg. 42511 ("we are concerned that allowing payment for office-based procedures under

the ASC benefit may create an incentive for physicians inappropriately to convert their offices into ASCs or to move all their office surgery to an ASC"); 72 Fed. Reg. 42519 (discussing desire that "beneficiaries and their physicians would continue to have a robust choice of sites where important preventative and other surgical services are paid under Medicare").  As these passages from the Secretary's own regulations reflect, rather than this being a case of how much money ASCs decide to share with CUI's members, as alleged by Defendants, this is more a case of CUI's members determining whether lithotripsy is performed in the ASC arena or elsewhere. The considerations that drove the decisions in *Renal Physicians Ass'n* and *Nat'l Wrestling Coaches Ass'n* are thus absent here.

## V.    CUI has stated a valid claim for relief under the anti-delegation doctrine.

The Constitution prohibits Congress from delegating its legislative powers to the executive branch without providing meaningful guidance and intelligible principles directing the administrative agencies in how to implement legislative directives.  *Schechter Poultry v. United States*, 295 U.S. 495, 537-41 (1935).  In its Complaint, CUI alleges that the MMA impermissibly delegates to the Secretary the authority to make rules and regulations regarding the administration of the revised ASC payment system without providing any intelligible principles to guide the Secretary.

In their Motion, Defendants disparage the anti-delegation doctrine, characterizing it as "virtually moribund" and only relevant as an "abstract matter."  Def.'s Mem. at 16, 18.  They further allege that the standard for measuring compliance with the doctrine is extraordinarily lenient, and repeat twice their contention that CUI's claim "borders on the frivolous."  Def.'s Mem. at 16, 18.  Yet, as recently as 2001, the Supreme Court recognized the vitality of the doctrine.  *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (reaffirming

"Congress must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform.") (citations omitted).

Moreover, despite the frequent exertions of the Supreme Court, as chronicled in Defendants' Motion, to find congressional statements of intelligible principles, the Supreme Court has yet to address the contours of the anti-delegation doctrine in a situation in which Congress not only has failed to provide intelligible principles, but also has limited the scope of judicial review of the agency's implementation of the authority granted it. In cases in which the Supreme Court agreed that a directive to be "fair and equitable" was a sufficient guiding principle, the courts were available to judge whether the agency adhered to that standard, as broad as it may be. *See Mistretta v. United States*, 488 U.S. 361, 379 (1989) ("Only if we could say that that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose…") (*quoting Yakus v. United States*, 321 U.S. 414, 425-426 (1944)). Here by contrast, Defendants are not only defending the unlimited autonomy conferred on the Secretary by the MMA, they are alleging that the Secretary's exercise of that autonomy is not subject to judicial review.

Even if the traditional reluctance of the courts to find violations of the anti-delegation doctrine applied here, Congress still has acted outside the wide latitude given it. In their Motion, Defendants failed to point the Court to any document where Congress in the MMA actually provided CMS with guidelines on how to implement the vast discretion given the agency. Defendants did not direct the Court's attention to a single citation in the U.S. Code or the Congressional Record where Congress articulated any intelligible principles by which CMS was

to implement the MMA.  Defendants instead claim that the purpose of the prospective payment system "is to establish fair rates of payment for medical services without distorting the incentives of providers or suppliers to furnish those services."   Def.'s Mem. at 18.   They cite, however, no statutory provision or legislative history in support of those alleged (and vague) standards. Indeed nothing in the MMA itself references those goals.

Perhaps recognizing that there is nothing in the MMA to which they can point to as evidence of guidance from Congress regarding the implementation of the revised ASC payment system, Defendants point to the GAO report as evidence of direction from Congress to the Secretary.  The GAO report, however, cannot fill the gaps in the MMA.

First, under the anti-delegation doctrine Congress can no more delegate the need to legislate meaningful guidance to GAO than it can to CMS.  The Constitution vests the legislative power in Congress, not the GAO.   The anti-delegation doctrine cannot be circumvented by dividing the impermissible delegation between multiple agencies.

Second, CUI alleges that the GAO only fulfilled half of its Congressional mandate to provide guidance on the revision of the ASC payment system.   Thus, to the extent that Defendants rely on the GAO report as the required guidance from Congress, then by Defendants' own admission, CMS was not operating under meaningful guidance (either from Congress or GAO) when it adopted the rules at issue in this case because the GAO report was never completed.

Third, even the partial report prepared by GAO is tainted.  It is undisputed that GAO did not publish its partial report prior to CMS's publication of the proposed ASC rule.  However, it appears that at least some version of the GAO report was available at that time, though not to the public, judging by a letter CMS sent to GAO on October 24, 2006 containing CMS's comments

on GAO's draft report.  *See* GOVERNMENT ACCOUNTABILITY OFFICE, Payment for Ambulatory Surgical Centers Should Be Based on the Hospital Outpatient Payment System (hereinafter "GAO report") at 25 (2006).  Thus, the Court can infer that, rather than allow the public to comment on its report during the notice and comment period for CMS's proposed ASC payment system rule, GAO secretly transmitted the report to CMS and sought CMS's, not the public's, comments on the draft report.  In effect, the very report which Congress directed CMS to "consider" in making its ASC determinations was, at least in part, the work product of CMS itself.

The relevant chronology of events began on August 23, 2006, when CMS published the proposed ASC payment system rule.  Compl. ¶ 44.  On October 10, 2006 the public notice and comment period for that proposed rule closed.  Compl. ¶ 45.  Two weeks later, on October 24, 2006, CMS sent a letter to GAO with comments regarding a draft version of the (as yet) unpublished GAO report.  GAO Report at 25.  It was not until November 30, 2006 that the GAO report was made publicly available, and the notice and comment period for the ASC payment system rule was never reopened.  Compl. ¶¶ 41, 47.  Thus, whatever partial report GAO did publish is not the impartial objective analysis which Congress ordered GAO to prepare, but rather an *ex post* rationalization of CMS's actions.

Finally, even if Congress could delegate to GAO the responsibility to articulate guidance and principles (which it cannot), and even if GAO had completed both phases of the report Congress ordered it to do (which it did not), and even if CMS had the GAO report in its possession before issuing its rule (which it did not), then the anti-delegation doctrine would still be violated because all section 626 of the MMA requires CMS to do is "consider" the GAO report.  In other words, CMS was left with complete discretion, unconstrained by principles from

either Congress or GAO, to form a revised ASC payment system.  Thus, even under the facts as seen in the light most favorable to Defendants (a standard inapplicable to the pending motion to dismiss), the GAO report cannot take the place of a clear and binding expression from Congress.

## VI.    Conclusion

As shown above, CUI has alleged facts sufficient to invoke this Court's jurisdiction and to state claims under the APA and the U.S. Constitution.  Defendants' Motion accordingly should be denied.

PLAINTIFFS REQUEST A HEARING ON DEFENDANTS' MOTION.

Respectfully submitted,
WINSTON & STRAWN

/s/_____
Thomas L. Mills  #911495
tmills@winston.com
Gordon A. Coffee  #384613
gcoffee@winston.com
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5000
Attorneys for Plaintiff Council for
Urological Interests

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 8th day of July, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/EDF.  I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF:  Joel McElvain, Joel.L.McElvain@usdoj.gov, counsel for Defendants.

/s/_____
Thomas L. Mills  #911495
tmills@winston.com
Gordon A. Coffee  #384613
gcoffee@winston.com
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5000
Attorneys for Plaintiff Council for Urological Interests

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COUNCIL FOR UROLOGICAL INTERESTS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, in his official capacity as | ) | |
| Secretary of the Department of Health and Human Services | ) | Civ. No. 07-2343-HHK |
| | ) | |
| And | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>ORDER DENYING DEFENDANTS' MOTION TO DISMISS</u>

Before the Court is Defendants Michael O. Leavitt and the United States of America's Motion to Dismiss.

Upon consideration of Defendants' Motion and the opposition thereto, it is hereby ordered that Defendants' Motion is DENIED.

DONE and ORDERED in chambers in Washington, District of Columbia, this __ day of _____, 2008.

_____
Hon. Henry H. Kennedy
United States District Judge